UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank Dennis FELIX,
Defendant–Appellant.

No. 89–7058.

United States Court of Appeals,
Tenth Circuit.

Feb. 28, 1991.

John Raley, U.S. Atty., and Paul G. Hess, Asst. U.S. Atty., Muskogee, Okl., for plaintiff-appellee.

Scott M. Anderson, Dallas, Tex., for defendant-appellant.

Before HOLLOWAY, Chief Judge, SEYMOUR and ANDERSON, Circuit Judges.

HOLLOWAY, Chief Judge.

In No. 89–7058, defendant Felix appeals his conviction in the United States District Court, Eastern District of Oklahoma, on various counts of a multi-count indictment charging him, *inter alia*, with conspiracy, manufacture, and possession with intent to distribute methamphetamine. He alleges that this conviction forced him to "run the gauntlet" again following a previous conviction in the United States District Court, Western District of Missouri, for a single count of attempt-to-manufacture methamphetamine, in violation of the protections afforded by the Double Jeopardy Clause as recently construed in *Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548

(1990). We agree that Felix has shown that his conviction on several counts in the Oklahoma trial entailed impermissible successive prosecutions for conduct underlying his Missouri conviction, and therefore we reverse his conviction on particular counts as enumerated below.

I

Defendant Felix was convicted following a jury trial in the Eastern District of Oklahoma for violations of 21 U.S.C. §§ 846 and 841(a)(1) ("the Oklahoma trial").[1] He had previously been convicted in the Western District of Missouri on a single count of attempt-to-manufacture methamphetamine, in violation of §§ 841(a)(1) and 846, ("the Missouri trial").[2] Both convictions arose from the following course of conduct and events:

Sometime in the Spring of 1987, a meeting (or meetings) between defendant Felix and unindicted co-conspirator Paul Roach resulted in an agreement whereby Felix would provide financing and other support to Roach, in exchange for Roach's instruction and assistance in "cooking" methamphetamine. A laboratory for the illegal enterprise was established in mobile trailers parked on an oil lease near Beggs, Oklahoma.

Felix and Roach obtained the chemicals and equipment for the Beggs lab in Tulsa, from George Dwinnells, a DEA confidential informant operating out of Tulsa Scientific, a chemical company. As a result of information provided by Dwinnells, the DEA seized the unattended Beggs lab on July 13, 1987, while a "cook" was in progress. Seized at the site were methamphetamine oil, illegal precursor chemicals, manufacturing equipment, and other evidence, some of which inculpated Felix.

Shortly thereafter, Felix phoned Dwinnells and arranged a meeting in a Tulsa bar. At the bar, under the observation of DEA agents, Felix ordered more chemicals and equipment from Dwinnells, secured by a $7,500 down payment. At Felix' behest,

---

**1.** On February 16, 1989, Felix was named in an eleven count indictment. The specific charges against Felix were as follows:

Count 1 charged Felix and others with conspiring to knowingly and intentionally manufacture methamphetamine/amphetamine; to knowingly and intentionally possess the same with intent to distribute; and to knowingly and intentionally distribute the same drug. This conspiracy was alleged to have occurred from on or about May 1, 1987, continuously to on or about August 31, 1987, in the Eastern District of Oklahoma and elsewhere;

Count 2 charged Felix and others with unlawfully, knowingly and intentionally manufacturing methamphetamine on or about July 13, 1987, in the Eastern District of Oklahoma;

Count 3 alleged that Felix and others possessed with intent to distribute five and a quarter pounds of methamphetamine on or about July 13, 1987;

Count 4 charged that Felix and others on or about July 13, 1987, knowingly and intentionally possessed approximately four gallons of methamphetamine oil with intent to manufacture methamphetamine;

Count 5 alleged that Felix and others on July 13, 1987, manufactured phenylacetone;

Count 6 alleged that Felix and codefendant Pinter from on or about June 1, 1987 to on or about July 13, 1987, in the Eastern District of Oklahoma, maintained and/or made available a place and enclosure for manufacturing methamphetamine/amphetamine;

Count 9 alleged that on or about June 21, 1987, in the Eastern District of Oklahoma and elsewhere, Felix traveled in interstate commerce from Texas to the Eastern District of Oklahoma and elsewhere with intent to promote, etc. the manufacture of methamphetamine/amphetamine; and thereafter attempted to promote, etc. the management, establishment, etc. of the manufacture of methamphetamine/amphetamine;

Count 10 charged that on or about July 13, 1987, in the Eastern District of Oklahoma and elsewhere, Felix willfully traveled in interstate commerce from Texas to the Eastern District of Oklahoma and elsewhere with intent to promote, etc. the promotion, or carrying on manufacture by traveling from Texas to the Eastern District of Oklahoma, and thereafter attempted to promote, etc. the promotion, etc. the manufacture of methamphetamine.

Defendant Felix was convicted on all these counts and received lengthy sentences.

**2.** The single count Missouri indictment, dated September 15, 1987, charged Felix with attempting to manufacture methamphetamine from on or about August 26, 1987, to on or about August 31, 1987, in the Western District of Missouri and elsewhere. Felix' conviction on this single count conviction was affirmed by the Eighth Circuit in *United States v. Felix,* 867 F.2d 1068 (8th Cir.1989).

Dwinnells transported the newly purchased chemicals and equipment by trailer to a hotel in Joplin, Missouri. Under the watchful eyes of the DEA, tipped off by Dwinnells, a controlled transfer of the trailer and its contents to Felix occurred. He was arrested shortly thereafter.

Felix was tried before a jury on the attempt-to-manufacture charge in Springfield, Missouri on November 30, 1987 and convicted. Before his April 1989 Oklahoma jury trial, Felix moved to dismiss the instant indictment on double jeopardy grounds arising from the Missouri conviction. *See* Defendant Felix' Plea of Double Jeopardy and Motion To Dismiss The Indictment, TR. Vol I, Tab 2. The trial judge in the Eastern District of Oklahoma denied Felix' motion by Order, dated March 20, 1989, holding:

> The § 846 offense in this indictment is for *Conspiracy* to Manufacture, in the Eastern District of Oklahoma.... None of the other substantive counts charge *Attempting* To Manufacture, and they are all alleged to have occurred in the Eastern District of Oklahoma. The court finds the offenses herein are separate and distinct from defendant's conviction in Missouri, and his double jeopardy argument is without merit.

TR. Vol. I, Tab 24, at 9 (emphasis in original).

## II

On appeal, Felix raises only one issue—that he was subjected to double jeopardy in violation of the Fifth Amendment, specifically the guarantee against being twice put on trial for the same offense. He premises this claim of error on the denial of his motion to dismiss based on double jeopardy grounds. For reasons given below, we are convinced that the Double Jeopardy Clause as interpreted recently in *Grady v. Corbin*, — U.S. —, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), requires the reversal of most of Felix' convictions. The trial judge did not have the benefit of that recent opinion.

The Double Jeopardy Clause affords three guarantees: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). Moreover, "it has long been understood that separate statutory crimes need not be identical—either in constituent elements or in actual proof—in order to be the same within the meaning of the constitutional prohibition." *Brown v. Ohio*, 432 U.S. 161, 164, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). It is the second protection that Felix relies upon, namely, that he not be forced to undergo successive prosecutions for the same conduct.

General double jeopardy analysis earlier focused on the so-called traditional *"Blockburger* test" which states that:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). The focus of that test is on the elements of the crimes, and "[i]f each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1294 n. 17, 43 L.Ed.2d 616 (1975) (citation omitted).

Recently, two significant opinions from the Supreme Court have shaped the double jeopardy analysis—first, *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), decided January 10, and second, the *Grady* case decided on May 29, 1990. *Grady* in particular makes clear that the Double Jeopardy Clause protections extend beyond the limitations expressed in the much earlier *Blockburger* test.

In *Dowling*, the defendant had been convicted of bank robbery in part on the basis

of testimony of Mrs. Henry. Although she was not involved in the bank incident itself, her testimony supported the government's modus operandi evidence and established a link between Dowling and an alleged accomplice at the bank. There the bank robber had worn a mask and carried a small pistol. Mrs. Henry testified that during a burglary attempt at her home two weeks earlier, she had unmasked a man that she said was Dowling. The man she struggled with was similarly, although not identically, masked and armed as the bank robber. In a previous trial for burglary where Mrs. Henry testified as an eyewitness, Dowling had been acquitted.

The Court rejected a claim that the Double Jeopardy Clause and the Due Process Clause barred the use of Mrs. Henry's testimony at the bank robbery trial in light of the earlier acquittal. Writing for the majority, Justice White made clear that "The issue is the inadmissibility of Henry's testimony." The majority rejected Dowling's reliance on the double jeopardy principles established in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), because in the *Dowling* case, the prior acquittal "did not determine an ultimate issue in the present case."

*Dowling*'s holding rests on two basic reasons. First, there was a lower standard of proof applicable to the use of Ms. Henry's modus operandi evidence than in the first trial involving Dowling. A jury might reasonably conclude that Dowling was the masked man who entered Mrs. Henry's home and give Rule 404(b) application to the evidence, even if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged in the first trial. Second, the Court deemed the evidence admissible because Dowling had not demonstrated that his acquittal in his first trial represented a jury determination that he was not one of the men who entered Mrs. Henry's home sufficient to justify application of *Ashe*'s collateral estoppel protection. 110 S.Ct. at 674. Dowling had actually not disputed his identity and instead argued that he was merely in Mrs. Henry's home to retrieve money from an individual in the house. Thus, there was not the

sharp determination of an issue in favor of Dowling as there was in *Ashe*.

*Grady v. Corbin* is a Double Jeopardy Clause application of much broader scope. In *Grady*, defendant Corbin, who had been drinking, drove his car across the center line and struck two oncoming vehicles, killing one person and injuring another. Although the assistant district attorney had responded to the accident and started an investigation, nevertheless, Corbin was issued two uniform traffic tickets for misdemeanor driving while intoxicated ("DWI") and failing to keep right of the median. Despite the investigation, Corbin's trial on the traffic tickets proceeded unimpeded. When the traffic court case was called, the prosecuting attorney was unaware that a death was involved and failed to object to the imposition of a minimal sentence after Corbin pled guilty.

Two months later, a grand jury indicted Corbin for reckless manslaughter, vehicular manslaughter, criminally negligent homicide, third degree assault, and DWI. In the bill of particulars, the three acts pled to establish the homicide and assault charges were (1) intoxicated driving, (2) failing to keep right of the median, and (3) driving too fast for weather and road conditions. Corbin's motion to dismiss the indictment on double jeopardy grounds was rejected, and he sought a writ of prohibition to bar prosecution on all counts. The Appellate Division denied the writ, but the New York Court of Appeals reversed. The DWI count was found barred by the state constitution, and the manslaughter counts were found to violate *Blockburger*, as DWI was deemed a lesser included offense under state law. The remaining homicide and assault counts were barred on Fifth Amendment grounds, and were the sole subject of the Supreme Court's review.

The Court barred Corbin's prosecution, using a two-step, double jeopardy analysis. The first step is the traditional analysis:

> To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause, a court must first apply the traditional *Blockburger* test. If application

of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred.

*Grady* at 2090 (citing *Brown*). The Court noted, however, that the *"Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense." 110 S.Ct. at 2092 (quoting *Brown v. Ohio,* 432 U.S. 161, 166–167 n. 6, 97 S.Ct. 2221, 2226 n. 6, 53 L.Ed.2d 187 (1977)). The *Grady* opinion clearly defined a second step to the double jeopardy analysis:

> "Thus, a subsequent prosecution must do more than merely survive the *Blockburger* test. As we suggested in [*Illinois v. Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) ], the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted. This is not an "actual evidence" or "same evidence" test. The critical inquiry is what conduct the state will prove, not the

evidence the state will use to prove that conduct. As we have held, the presence of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding. *See Dowling v. United States,* 493 U.S. ——, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)."

110 S.Ct. at 2093.[3]

As yet, few appellate courts have construed *Grady,*[4] but its intended breadth is obvious from its language. The Third Circuit has said that "the language employed by the [*Grady*] Court in its formulation of the 'same conduct' test could be interpreted as extending double jeopardy protection to all situations where the government intends again to prove conduct constituting an offense subject to an earlier conviction." *United States v. Pungitore,* 910 F.2d 1084, 1110 (3d Cir.1990). The Third Circuit, however, declined to adopt that stance believing that "[t]he double jeopardy analysis in *Brown* and *Grady,* ..., cannot easily be transposed to the RICO context[.]" *Id.* We note, however, that the Third Circuit's analysis stems from an approach to double jeopardy issues that this circuit has already rejected, and is thus inapposite.[5]

---

3. Like *Grady,* this circuit has also relied on the reasoning in *Vitale* to expand double jeopardy analysis beyond the four corners of *Blockburger's* facts. *See United States v. Genser,* 710 F.2d 1426, 1428–31 (10th Cir.1983) (reversing the defendant's conviction on double jeopardy grounds because the successively prosecuted charges of "distribution" and "dispensation" both required proof of "knowing or intentional delivery of a controlled substance"). *Genser* itself calls for the reversal of convictions as outlined below.

4. *See, e.g., United States v. Pungitore,* 910 F.2d 1084 (3d Cir.1990) (limiting *Grady* to "single act" crimes); *United States v. Esposito,* 912 F.2d 60 (3d Cir.1990) (same); *United States v. Russo,* 906 F.2d 77 (2nd Cir.1990) (per curiam) (reversing the defendant's conviction of obstructing justice under *Grady* where the conviction followed a previous acquittal for RICO conspiracy using the identical obstruction charge as a predicate offense).

5. The Third Circuit's approach bifurcates those cases which involve multiple criminal acts falling within a single statutory scheme (*i.e.,* CCE or RICO) from what may be deemed "single act" cases. *See, e.g., Pungitore* at 1110–11. Under this approach, *Garrett v. United States,* 471 U.S.

773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (holding that conviction of both CCE and the underlying predicate offense does not violate double jeopardy) controls the former, and *Grady* controls only the latter. This Court, however, has already rejected adoption of different rules based on the ability to distinguish a series of events from a single event in the double jeopardy context. *See e.g., United States v. Savaiano,* 843 F.2d 1280, 1292–93 (10th Cir.1988) (refusing to adopt the Ninth Circuit's "single act" rule on consecutive sentences because of the "difficulty in ascertaining what is and what is not a single course of conduct"). Moreover, the Third Circuit's view is predicated on statutory delineation of separable acts. We are mindful, however, of the Supreme Court's statement in *Brown v. Ohio* that: "[t]he Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown,* 432 U.S. at 161, 97 S.Ct. at 2221. Thus, consistency with *Savaiano,* at a minimum, justifies our departure from the Third Circuit's approach.

Conversely, even within the Third Circuit's framework, *Grady* still controls here. A federal drug conspiracy charge does not require proof of overt acts. Thus, this type of conspiracy is

We are in accord with the more recent application of *Grady* in *United States v. Calderone and Catalano*, 917 F.2d 717 (2nd Cir.1990). There the Second Circuit reversed the district court's denial of defendants' motion to dismiss the indictment on double jeopardy grounds, one judge dissenting. At their first trial, Calderone and Catalano had been granted a directed verdict based on the insufficiency of the evidence against them in an international, multi-drug smuggling conspiracy trial. Immediately after the directed verdict, the government filed a new indictment against them. The second indictment charged a narrower conspiracy to distribute heroin in New York City, along with 24 counts of telephone use to facilitate the crimes, and 3 counts of distribution. This "smaller" conspiracy overlapped the earlier one as to time and some overt acts.

The *Calderone* court held that "the 'same conduct' test announced in *Grady* bars prosecution of all counts of the ... indictment." 917 F.2d at 720. The court, as we do, found the scope of *Grady* to be of some breadth: "the 'same conduct' test announced in *Grady* applies to all double jeopardy claims arising in the context of successive prosecutions." 917 F.2d at 721. More importantly, *Calderone* rejected the same argument advanced by the government here, namely, that the evidence presented at both trials was not used to prove the same conduct because the conduct proven was a distinct conspiratorial agreement. *See* Appellee's brief at 16–17. As explained in *Calderone:*

> [T]he "agreement" in nearly all conspiracy prosecutions is not proved directly, such as by the testimony of conspirators that "we agree to sell narcotics." Rather, the "agreement" is simply alleged, and to prove its existence the government presents evidence of the conspirator's conduct—what they said and did— and asks the jury to infer from this con-

duct that the criminal agreement has been established. The conduct in most conspiracy cases ... is the focus of the case. Under *Grady*, this conduct may not be prosecuted a second time in order to establish an "agreement" that differs from the first crime only in that the indictment happens to describe it differently.

917 F.2d at 721. The government, then, cannot avoid the strictures of the Double Jeopardy Clause merely by indicting and convicting Felix on statutorily distinct charges.

■ As shown below, the fact that Felix' two trials constitute successive prosecutions arising from virtually the same conduct involving the same actors and overlapping time frames signals the need to apply the *Grady* double jeopardy analysis. A court should carefully apply double jeopardy analysis where a defendant's constitutional rights are threatened by prosecutors who have the opportunity to draft indictments in which they can allege *apparently* separate criminal conduct. *See Calderone*, 917 F.2d at 721, 722 (Newman, J., concurring).

Considering, as we must, the proper application of both *Grady* and *Dowling*, we are persuaded that *Grady* lays down the principle which applies with special force here. *Dowling* and *Grady* are not contradictory and we can, and must, give full application to both holdings. *Dowling* concerned, as noted, the admissibility of evidence in conformity with the collateral estoppel principle of *Ashe* [6]; *Grady* concerned the protection afforded by the Double Jeopardy Clause from successive prosecutions for the same conduct which is violative of criminal statutes. It is this latter protection under the Clause which is implicated here and this causes us to focus mainly on the teaching of *Grady*. We now

---

inherently the "single act" sort of crime which the Third Circuit finds controlled by *Grady*. *See Pungitore*, 910 F.2d at 1110–11.

**6.** The only link between the two crimes in *Dowling* was the fact that the defendant had allegedly been identified at the time of both of the crimes

as similarly garbed. There was no same act or conduct at issue in the two prosecutions for which Dowling could be criminally convicted. Rather, Dowling was charged with separate crimes, arising out of separate conduct.

turn to the facts of the instant case which we will consider under these principles.

### III

■ Consideration of the record of the Oklahoma trial and the evidence summarized by the Eighth Circuit in the Missouri trial shows significant duplication of the conduct proved to establish the Missouri offense and most of the Oklahoma convictions. Evidence as to such conduct comes from the testimony of the following witnesses, presented at both trials: Paul Roach (Government Witness); George Dwinnells (DEA Confidential Informant); John Coonce (DEA agent); and Carolyn Ruybal (DEA chemist). *See generally Felix*, 867 F.2d at 1070–71; TR. Vol. V, 317–76, 475–82; TR. Vol. VI, 792–93; TR. Vol. VII, 898, 912.

The Eighth Circuit described the conduct found sufficient to convict Felix of the attempt to manufacture methamphetamine, in part, as follows:

> With regard to the first element [criminal intent], evidence was presented that Felix actively learned to cook methamphetamine, toward that end supplied his instructor with methamphetamine-making chemicals and equipment, and eventually made methamphetamine at a lab near Beggs, Oklahoma.... Evidence further showed that Felix subsequently ordered enough chemicals and equipment to make several kilos of methamphetamine and that, upon receipt of the items, he planned to produce the drug at a lab of his own. Concerning the second element of attempt [a substantial step

toward commission of the substantive attempt offense], ... the Government's evidence showed that, after learning how to make methamphetamine, Felix ordered the necessary chemicals and equipment, had a trailer full of the chemicals and equipment delivered to him, and paid $7,500 for the delivered goods....

*Felix*, 867 F.2d at 1071 (citation omitted).

■ In the subsequent prosecution in Oklahoma, a number of the counts in the indictment were based on proof of the same conduct. As to Count 1, the conspiracy charge, the duplication was extensive, contrary to *Grady*. In both trials it was proven that Felix met with Roach and agreed to furnish him chemicals and equipment so that under Roach's tutelage, methamphetamine could be produced. *See Felix*, 867 F.2d at 1070; and here, TR. Vol. V, 317, 337–39, 341, 357, 373–76. Furthermore, it was proven at both trials that Felix met Dwinnells in a Tulsa bar, informed him of the Beggs lab bust, and gave him a $7,500 down payment with an order for chemicals and equipment to manufacture methamphetamine. Felix later called to increase his order, and instructed Dwinnells to deliver the chemicals and equipment to him in Joplin, Missouri. Felix then met Dwinnells in Joplin and took possession of the goods. *See Felix*, 867 F.2d at 1070–71 and n. 4; and here, TR. Vol. V, 475–82; TR. Vol. VI, 792–93. This conduct was alleged in Overt Acts 17 and 18 of the Oklahoma conspiracy charge, Count 1, and was used to show that Felix had conspired to manufacture methamphetamine in the Oklahoma case.[7] Previously in Missouri,

---

7. We are mindful that 21 U.S.C. § 846 does not require proof of an overt act in the prosecution of a drug conspiracy. That does not mean, however, that we should disregard the conduct represented by the overt acts pled in the instant Oklahoma indictment. The proof of such conduct as is alleged in the overt acts in the Oklahoma case tended to show the criminal agreement for the conspiracy charged in Oklahoma, and thus was a significant part of the proof in the Eastern District of Oklahoma. Some of the acts occurred elsewhere, but that was contemplated by the Oklahoma indictment which alleged in Count 1 a conspiracy in the Eastern District of Oklahoma "and elsewhere" from on or about May 1, 1987, continuously to on or about August 1, 1987.

The conduct alleged as the overt acts was before the Oklahoma trial jury as the very "actions in furtherance of that conspiracy," *see* TR. Vol. VII, 1001. Furthermore the government's closing argument expressly emphasized the relevance of the conduct described in overt acts 17 and 18 to the jury's determination of guilt. *See id.* at 1002, 1018. And DEA chemist Ruybal, who testified in both trials, conceded that the physical evidence admitted here included "the identical exhibits introduced at [the Missouri] proceeding[.]" *Id.* at 912. The indictment was read to the jury at the beginning of trial and furnished to the jury with the instructions. VII

however, the identical conduct established both the intent and "substantial step" elements of the attempt to manufacture methamphetamine charge.

In fact, the government's response below to Felix' motion to dismiss on double jeopardy grounds makes clear the violation of the *Grady* principles:

> The possession of chemicals and equipment necessary to the manufacture of methamphetamine, overt acts 17 and 18 in the present indictment, *was the activity leading to defendant's conviction for attempted manufacture in the Western District of Missouri.*

Government Response below, p. 2 (emphasis added).

In addition to the overlap in the conduct giving rise to the successive prosecutions, the two offenses did not involve distinct persons, places, or times. Both prosecutions focused on Felix and Roach as the actors. Both prosecutions presented evidence of acts occurring outside the borders of the respective states in which the trials took place. The instant indictment alleged that the conspiracy took place in the "Eastern District of Oklahoma *and elsewhere.*" *United States v. Felix*, Indictment No. 89–16–CR (emphasis added). Similarly, the indictment alleged that one of the means of the conspiracy was to manufacture drugs for distribution in the "Eastern District of Oklahoma *and elsewhere.*" *Id.* (emphasis added). Overt act No. 18 alleged that on August 31, 1987, Felix, "while at a location in Missouri, possessed chemicals and equipment necessary in the manufacture of methamphetamine." Finally, the relevant time frames of the two indictments also overlap. The Missouri prosecution was premised on conduct that occurred from the spring of 1987 to August 31, 1987. *Felix*, 867 F.2d at 1070. The Oklahoma prosecution was premised on conduct that occurred from "about" May 1, 1987 to Au-

gust 31, 1987 (Count 1); and on July 13, 1987 (Counts 2, 3, 4, and 5).

Accordingly, under the clear principle pronounced in *Grady* against successive prosecutions for the same conduct, we hold that the successive prosecution of Felix in Oklahoma for the same conduct for which he was previously convicted in Missouri violated the Double Jeopardy Clause. Thus the Count 1 conspiracy conviction of Felix in the instant case cannot stand.

■ As to the substantive offenses charged in Counts 2 through 5, in both trials it was proven that Roach and Felix bought chemicals and equipment from Dwinnells at Tulsa Scientific for the purpose of manufacturing and distributing methamphetamine. *See Felix*, 867 F.2d at 1070–71; and here, TR. Vol. V, 346–48, 356. They used these chemicals and equipment to create precursor chemicals (*e.g.*, methamphetamine oil and phenylacetone), which in turn were subsequently used to generate methamphetamine at the Beggs, Oklahoma lab. *Felix*, 867 F.2d at 1070–71; and here, TR. Vol. V, 346–48, 354–56, 360–62, 367–68, 370–71. This conduct served to establish the intent element of the attempt to manufacture methamphetamine in the Missouri trial; it also served as factual support for Felix' convictions in Oklahoma of possessing precursor chemicals (Counts 4 and 5), and manufacturing and possessing with intent to distribute methamphetamine (Counts 2 and 3). Hence, Felix' conviction on these Counts must also be reversed.

■ Likewise Count 6 of the Oklahoma indictment clearly was a successive prosecution for conduct that was the subject of the Missouri prosecution. Count 6 here charged that from on or about June 1, 1987, in the Eastern District of Oklahoma, Felix and co-defendant Pinter maintained and/or made available a place and enclosure for manufacturing methamphetamine/amphetamine. Proof during the

R. 1070. Thus, Felix' conduct as to the purchase of chemicals and equipment in the Tulsa bar and the delivery of the same in Joplin, Missouri, was proven and argued in the successive trials as a basis for the successive convictions.

This circumstance is similar to that discussed by Judge Newman in his concurring opinion in

*United States v. Calderone and Catalano*, 917 F.2d at 725. In *Calderone*, Judge Newman said that the government was contending that the defendant "committed these [overt] acts in furtherance of the Adamita conspiracy and that these acts showed their participation in that conspiracy."

Oklahoma trial included Roach's testimony that he knew Felix in about May 1987, V R. 316; that in Texas Felix discussed finding a place to set up "the lab," id. at 337; Felix said he wanted Roach to take some of the glassware to Okmulgee, Oklahoma; Roach met a man named B.J. (codefendant Pinter) there and they went to a location near Beggs, Oklahoma (which is in Okmulgee, County), id. at 344; Felix showed up and they discussed the glassware, id. at 346–47; Felix and Roach went to Tulsa and bought glassware, id. at 347–48; after Father's Day, Felix and Roach had conversations at the lab site and Felix and Roach "just kind of worked together on [throwing away trash at the lab site]." Id. at 368. Dennis [Felix] paid Roach $4,000 cash for Roach's part of the lab work; they did 4, 5 or maybe 6 cooks. Id. at 370.

This proof offered to support Count 6 of the Oklahoma indictment was close to that outlined in the Eighth Circuit *Felix* opinion on Roach's testimony that Felix furnished Roach methamphetamine-making chemicals during the Spring of 1987; that he and Felix bought chemicals and equipment in Tulsa and eventually cooked methamphetamine in a trailer near Beggs; and that on July 13, 1987, officers seized the trailer near Beggs. *Felix*, 867 F.2d at 1070. The evidence of this conduct was identified by the Eighth Circuit as presented in connection with the essential elements of the attempt to manufacture methamphetamine prosecution in the Missouri federal case: (1) an intent to engage in the criminal conduct; and (2) conduct constituting a "substantial step" toward the substantive offense, strongly corroborating the actor's criminal intent. *Felix*, 867 F.2d at 1071. The subsequent Oklahoma trial on such evidence of knowingly maintaining a place for manufacturing the controlled substance (see allegations of Count 6, note 1, *supra*) thus subjected Felix to a successive trial for the same conduct, contrary to *Grady*.

Thus the Count 6 conviction also cannot stand.

■ We conclude, however, that the defendant Felix has not shown grounds for disturbing his convictions and sentences on Counts 9 and 10. The defendant bears the burden of proving a double jeopardy claim. *United States v. Cardall*, 885 F.2d 656, 665 (10th Cir.1989). Count 9 charged interstate travel on or about June 21, 1987 from Texas to the Eastern District of Oklahoma and elsewhere with intent to promote, etc., the management, etc., of manufacture of methamphetamine/amphetamine. Count 10 made similar allegations of interstate travel on or about July 13, 1987, from Texas to the Eastern District of Oklahoma and elsewhere with the intent to promote, etc., the same unlawful conduct. The closest that the conduct outlined in the Eighth Circuit *Felix* opinion gets to the conduct charged in the instant Counts 9 and 10 is presented by an allegation that on July 13, 1987, law enforcement officers seized the trailer near Beggs, Oklahoma; that Felix instructed Dwinnells to deliver chemicals and equipment to the Joplin, Missouri Holiday Inn; that Felix and Dwinnells met at that motel where Felix had rented a room; and that a controlled delivery was arranged to be made in Joplin on August 31, 1987. 867 F.2d at 1070–71.

We cannot agree that the double jeopardy claim was established as to the Count 9 and 10 convictions and sentences, which was a burden the defendant Felix had to carry.[8]

In sum, we conclude that the Double Jeopardy Clause of the Fifth Amendment barred defendant Felix' successive prosecution on Counts 1, 2, 3, 4, 5, and 6 of the Oklahoma indictment and his convictions, sentences, and special $50 assessments on those Counts are REVERSED. His convictions on Counts 9 and 10 need not be disturbed and are AFFIRMED; however, the

---

**8.** At first glance, the remaining counts: 9 and 10 (interstate travel to promote manufacturing) seem akin to the telephone counts also barred in *Calderone*. Arguably, they also "allege[ ] as an element the facilitation of the conspiracy charged in count one." 917 F.2d at 726 (Newman, J., concurring). We are not, however, inclined to go so far on the record before this Court.

case is remanded for re-sentencing on said Counts 9 and 10.

IT IS SO ORDERED.

STEPHEN H. ANDERSON, Circuit Judge, dissenting:

I respectfully dissent.

Frank Dennis Felix was convicted in the United States District Court for the Western District of Missouri of attempting to manufacture methamphetamine. *See United States v. Felix*, 867 F.2d 1068, 1070 (8th Cir.1989) (affirming the conviction). But nothing in the Double Jeopardy Clause, or the Supreme Court jurisprudence interpreting that provision, barred Felix's subsequent prosecution in the United States District Court for the Eastern District of Oklahoma for geographically and temporally separate acts that violated federal drug laws. In holding that the Double Jeopardy Clause requires reversal of six of Felix's drug convictions, the majority overlooks the plain language of the Supreme Court's recent holding in *Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), and adopts a dangerously broad interpretation of the Double Jeopardy Clause.

## I. The *Grady* Rule

The majority relies upon the Supreme Court's recent decision in *Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). This reliance is misplaced. The majority opinion mischaracterizes *Grady's* rule. The majority refers to a bar against: "significant duplication of conduct proved," Majority Opinion at 1529, "counts in the indictment ... based on proof of the same conduct," *id.* at 1529, and "successive trial[s] for the same conduct." *Id.* at 1531. The majority similarly cites "the clear principle pronounced in *Grady* against successive prosecutions for the same conduct." *Id.* at 1530.

The *Grady* Court, however, did not establish a "same conduct" rule.[1] By its plain language, *Grady* only bars subsequent prosecutions

> in which the government, *to establish an essential element* of an offense charged in that prosecution, will prove *conduct that constitutes an offense for which the defendant has already been prosecuted.*

*Grady v. Corbin*, 110 S.Ct. at 2093 (emphasis added). This language comprises several crucial elements, none of which the majority discusses or applies because it lumps them together into a "same conduct" test. The majority further confuses the matter by switching, with no explanation, to a comparison of the evidence presented at each trial, an approach explicitly rejected by *Grady*. 110 S.Ct. at 2093.

Under *Grady's* plain language, the proper approach begins by identifying the conduct sought to be proved in the instant prosecution, as set forth in the indictment. Once that is ascertained, two important questions must be answered: (1) is this conduct that constitutes an offense for which the defendant has already been prosecuted? and (2) is it being proven to establish an essential element of the offense for which the defendant is being prosecuted? The *Grady* rule bars the instant prosecution *only* if the answer to *both* questions is affirmative. There are important sub-parts to each of the two questions. Under the first question, for example, the conduct may not "constitute an offense." Or, even if it does constitute an offense, it may not have been an offense "for which the defendant had already been prosecuted." Under the second question, it may be that the conduct does not "establish" an essential

---

1. The majority begins its double jeopardy analysis on the wrong foot when it equates the term "same offense" found in *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), with "same conduct." Majority Opinion at 1525. Although both the Second Circuit, *United States v. Calderone*, 917 F.2d 717 (1990), and the Third Circuit, *United States v. Pungitore*, 910 F.2d 1084 (1990), also style the *Grady* rule as the "same conduct" test, they do not apply the majority's simplified analysis to the facts of those cases. As the majority opinion evidences, this characterization risks misapplication of the rule because it suggests that the Double Jeopardy Clause analysis entails a simple comparison between any conduct that the government seeks to prove in two prosecutions.

element, or it may establish an element that is not "essential."

It is not for this court to re-write *Grady*'s rule. We must give meaning to *each* of its elements. When that is done, the rule does not bar Felix's prosecution in Oklahoma.

## II. Counts 2 through 6

The majority reverses Felix's convictions on Counts 2 through 6. The stated rationale is that much of Felix's conduct serving as the basis for these Oklahoma convictions had been introduced into evidence at Felix's trial in Missouri.

But the *Grady* rule does not bar subsequent proof of *all* conduct introduced into evidence in a previous trial. *Grady* only bars the prosecution in a subsequent trial from proving "conduct that constitutes an offense for which the defendant has already been prosecuted." *Grady v. Corbin*, 110 S.Ct. at 2093. As the rule suggests, the conduct alleged in the subsequent prosecution in *Grady* constituted separately cognizable offenses for which Corbin had already been prosecuted.[2]

In contrast, Felix had never been prosecuted for the conduct alleged in Counts 2 through 6 of the Oklahoma prosecution. Each of those counts was based on Felix's conduct on or before July 13, 1987, in establishing and operating the methamphetamine lab in Beggs, Oklahoma. R. Vol. I at Tab 1. In the Missouri trial, however, Felix had only been prosecuted for his conduct "[f]rom on or about August 26, 1987, to on or about August 31, 1987," over a month *after* the July 13 DEA seizure of the Beggs lab. Missouri Indictment, R.Supp. Vol. II at 1.

Evidence regarding Felix's involvement with the Beggs lab was admitted in the Missouri trial under Rule 404(b) of the Federal Rules of Evidence[3] as "highly probative of Felix's knowledge and intent." *United States v. Felix*, 867 F.2d 1068,

1072–73 (8th Cir.1989). In its instructions to the jury, the District Court in Missouri emphasized that Felix was not being prosecuted for the earlier Oklahoma acts:

You have heard evidence that the defendant *previously* committed a crime *similar* to the one charged in this case. You may not use this *evidence* to decide whether the defendant carried out the *physical acts involved in the crime charged here*. However, if you are convinced beyond a reasonable doubt, by other evidence, that the defendant did carry out the physical acts involved in the crime charged here, then you may consider this *evidence only* on the question of motive, opportunity, preparation, plan, knowledge, identity or absence of mistake.

*United States v. Felix*, 867 F.2d at 1074–75 (citing Fed.R.Evid. 404(b)) (emphasis added).

It is clear that Felix was not prosecuted in the Missouri case for the conduct that the government proved with respect to Counts 2 through 6 of the Oklahoma prosecution. Introducing Rule 404(b) evidence of a prior bad act is not prosecution for that act. *United States v. Van Cleave*, 599 F.2d 954, 957 (10th Cir.1979) (evidence of conduct for which the defendant had already been prosecuted "was not introduced for the purpose of retrying [him;] it was introduced to prove motive and intent in connection with ... the charge for which he was then on trial"). As the Supreme Court explained in *Grady*,

The critical inquiry is what *conduct* the State will prove, not the *evidence* the State will use to prove that conduct. As we have held, the presentation of specific evidence in one trial does not forever prevent the government from introducing the same evidence in a subsequent proceeding. *See Dowling v. United*

---

**2.** Those separately cognizable offenses were 1) driving while intoxicated, and 2) failing to keep right of the median. *Grady v. Corbin*, 110 S.Ct. at 2088, 2094.

**3.** Fed.R.Evid 404(b) provides, in pertinent part:

"Evidence of other crimes, wrongs, or acts is ... admissible ... as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence or mistake or accident."

*States*, 493 U.S. ——, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).

*Grady v. Corbin*, 110 S.Ct. at 2093.

In holding that *Grady* mandates the reversal of Counts 2 through 6, the majority goes far beyond what the Supreme Court intended. First, the majority seems to require what the Supreme Court explicitly rejected: "that all charges against a defendant growing out of a single criminal transaction be tried in one proceeding." *Grady v. Corbin*, 110 S.Ct. at 2094, n. 15 (quoting *Jones v. Thomas*, 491 U.S. 376, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989) (Brennan, J., dissenting), *reh'g denied*, —— U.S. ——, 110 S.Ct. 12, 106 L.Ed.2d 627 (1989)). Even this "same transaction" test, however, would not bar Felix's Oklahoma prosecution for Counts 2 through 6. His involvement in manufacturing methamphetamine at the lab in Beggs, Oklahoma, was temporally and geographically separate from his subsequent attempt to manufacture methamphetamine in Missouri, which occurred over a month after the Beggs lab was raided. In no sense were these events "a single criminal transaction." *Id.*[4]

Second, the majority's interpretation of *Grady* effectively eviscerates Fed.R.Evid. 404(b). The majority equates the introduction of Rule 404(b) prior bad act evidence with prosecution for the bad acts. If that were the case, prosecutors could *never* introduce Rule 404(b) evidence in situations where the defendant had already been prosecuted for the bad act without violating the Double Jeopardy Clause. Moreover, if Rule 404(b) evidence were allowed (because the conduct had not been prosecuted), it could never be introduced again without violating the Double Jeopardy Clause. It is inconceivable that the *Grady* Court, without any such indication, would limit so drastically the application of Rule 404(b).

Actually, the Supreme Court implicitly rejected such an incongruous interpretation of Rule 404(b) in *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).[5] At Dowling's trial for robbing a bank while wearing a ski mask and carrying a small pistol, a witness testified that a similarly masked and armed man broke into her home about two weeks after the bank robbery, that a struggle ensued, and that she unmasked the intruder, whom she identified as Dowling. The government offered this Rule 404(b) evidence in order to strengthen its identification of Dowling as the bank robber. *Dowling v. United States*, 110 S.Ct. at 670. The residential burglary was an offense for which Dowling had already been prosecuted and acquitted. But the Supreme Court held that introducing the Rule 404(b) testimony did not violate the Double Jeopardy Clause. *Id.* at 672–73.[6]

---

**4.** The majority obfuscates the delineation between Felix's involvement in the Beggs laboratory and his subsequent attempt to set up another laboratory by describing the facts as a "course of conduct and events." Proposed Majority Opinion at 1524. One could characterize a lifetime criminal's entire career in this fashion, but it would not mean the government, under the Double Jeopardy Clause, could only prosecute him once.

**5.** While the dissenters in *Grady* express their opinion that the decision is inconsistent with *Dowling, see* 110 S.Ct. at 2095–96 (O'Connor, J., dissenting); *id.* at 2102 (Scalia, J., with whom Rehnquist, C.J., and Kennedy, J., join, dissenting), the *Grady* majority gives no such indication. In fact, the opinion cites to *Dowling* for the proposition that "the presentation of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding." *Grady v. Corbin*, 110 S.Ct. at 2093. Given this citation, and, "in the face of the challenge raised in the

dissents, [*Grady* ] should be read, if at all possible, not to overrule *Dowling*." *United States v. Calderone*, 917 F.2d 717, 724 (2d Cir.1990) (Newman, J., concurring).

**6.** The majority attempts to distinguish *Dowling* by suggesting that it only involved a question regarding the admissibility of evidence. The evidentiary question, however, was whether admission under Rule 404(b) of Dowling's prior bad act, for which he had already been tried and acquitted, violated the Double Jeopardy Clause.

In holding that it did not, the Court pointed to one of the many differences between introducing Rule 404(b) evidence of a bad act and prosecution for that act: Rule 404(b) evidence is governed by a lesser standard of proof. *Dowling v. United States*, 110 S.Ct. at 672–73. The standard for Rule 404(b), recently reaffirmed in *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988), is whether "the jury can reasonably conclude that

In short, nothing in Supreme Court's Double Jeopardy jurisprudence supports the reversal of Felix's convictions on Counts 2 through 6.

### III. Count 1: Conspiracy

The majority further demonstrates a disregard for the plain language of *Grady*'s rule in reversing Felix's conviction on the conspiracy count. The stated rationale is that the conspiracy count was premised on conduct for which Felix had been previously prosecuted in Missouri. Majority Opinion at 1530. But this is neither a correct statement nor a correct application of *Grady*'s rule. It bears repeating that *Grady*'s rule only bars situations in which the prosecution,

> to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant had already been prosecuted.

*Grady v. Corbin,* 110 S.Ct. at 2093. In reversing the conspiracy count, the majority does not once cite to or apply this actual language. As a result, the majority overlooks both of its crucial elements.

#### A.

As with Counts 2 through 6, the conduct in question here does not "constitute an offense for which the defendant has already been prosecuted." *Grady v. Corbin,* 110 S.Ct. at 2093.

Here, too, the majority mistakenly focuses on the overlap of evidence presented at each trial. *See* Majority Opinion at 1529–1530. This approach blurs the distinction described in *Grady* between previously prosecuted conduct and evidence used to prove that conduct. The majority opinion, for example, states "The Missouri prosecution was premised on conduct that occurred from the spring of 1987 to August 31, 1987." Majority Opinion at 1530. To support this statement, it cites to the Eighth Circuit's review of the Missouri conviction. The cited text, however, is the Eighth Circuit's discussion of the *evidence* admitted

the act occurred and that the defendant was an actor." This is obviously far less exacting than

at trial (including the Rule 404(b) evidence discussed above in Section II). *See United States v. Felix,* 867 F.2d at 1070. As demonstrated above, the indictment reveals that Felix was only prosecuted for conduct committed "[f]rom on or about August 26, 1987, to on or about August 31, 1987...." R.Supp. Vol. II at 1. Felix had not already been prosecuted for his conduct prior to August 26.

The more difficult question is raised by the two overt acts alleged in Count 1 that did occur between August 26 and 31, 1987. Two of the eighteen overt acts alleged in this conspiracy count were:

> 17. On August 26, 1987, FRANK DENNIS FELIX, while in Tulsa, Oklahoma, provided money for the purchase of chemicals and equipment necessary in the manufacture of methamphetamine.

> 18. On August 31, 1987, FRANK DENNIS FELIX, while at a location in Missouri, possessed chemicals and equipment necessary in the manufacture of methamphetamine.

R. Vol. I, Tab 1 at 3–5.

Whether these acts constitute the offense for which Felix had been prosecuted in Missouri depends on how far one is willing to expand the meaning of the word "offense." Felix was prosecuted for attempt to manufacture methamphetamine. R.Supp. Vol. II at 1. The attempt offense consists of two elements:

> (1) an intent to engage in criminal conduct, and (2) conduct constituting a "substantial step" towards the commission of the substantive offense which strongly corroborates the actor's criminal intent.

*United States v. Felix,* 867 F.2d at 1071 (quoting *United States v. Joyce,* 693 F.2d 838, 841 (8th Cir.1982)). Overt acts 17 and 18 of the Oklahoma indictment do not constitute the attempt offense. At most, the two acts constitute the second element of the attempt offense: the "substantial step" towards commission of the substantive crime.

the "beyond a reasonable doubt" standard applicable to the actual offense.

The Second Circuit has interpreted the word "offense" broadly. It has held that *Grady* bars the subsequent prosecution from proving "conduct constituting the entirety of a previously prosecuted offense (as in *Grady*), or the entirety of an element of such an offense, or the entirety of an element of a distinct component of such an offense." *United States v. Calderone*, 917 F.2d 717, 725 (2d Cir.1990) (Newman, J., concurring). However, in the absence of any indication from the Supreme Court that it intended such a liberal interpretation of the word "offense," I would not adopt such an expansive holding. Applying *Grady*'s plain language, the two overt acts do not constitute the attempt offense for which Felix was already prosecuted in Missouri.

### B.

Moreover, proof of the two overt acts at issue did not "establish an essential element" of the offense for which Felix was being prosecuted. Count 1 charged Felix and three other individuals with conspiring to manufacture, possess with intent to distribute, and distribute methamphetamine. R. Vol. I, Tab 1 at 1–2. The essential elements of conspiracy are as follows:

> The essence of the crime of conspiracy is an agreement to violate the law. The evidence ... need only establish the *existence* of a conspiracy and that a defendant *knowingly contributed* his efforts in furtherance thereof.

*United States v. Savaiano*, 843 F.2d 1280, 1293 (10th Cir.1988) (citations omitted) (emphasis in original). "[A]n overt act is *not* a *necessary* element of conspiracy under the federal drug enforcement statutes." *Id.* at 1294 (emphasis added).

One position, then, would be that since overt acts are not an essential element of the conspiracy offense, *Grady* does not bar their introduction. But such a conclusion does not fully apply *Grady*'s plain language. It is arguable that the two overt acts, while not themselves an essential ele-

ment, were introduced by the prosecution to *establish* an essential element: the agreement to violate the drug laws. Indeed, although "[t]he essence of the crime of conspiracy is an agreement to violate the law[,] ... [t]he nature of the offense of conspiracy with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence." *Id.* at 1293.

Careful scrutiny, however, reveals that the overt acts at issue here did not meaningfully "establish" an essential element of the conspiracy. The indictment reveals that the crux of the Oklahoma conspiracy concerned the conspirators' activities surrounding the Beggs lab. The two overt acts encompass Felix's illegal activity *after* the government seized the Beggs lab. Nothing in the evidence links any of Felix's co-conspirators to his subsequent attempt to manufacture methamphetamine in Missouri. In other words, the two overt acts do not "establish" an agreement between Felix and his co-conspirators in Oklahoma, nor do they "establish" any contribution to the Oklahoma conspiracy.[7]

The majority incorrectly relies on *United States v. Calderone* to support its reversal of the conspiracy conviction. *See* Majority Opinion at 1527. Examination of the three opinions filed in that case reveals that the *Calderone* panel would not have reversed Felix's conviction on this count. Judge Newman, in his concurring opinion, explicitly rejected the interpretation of "establish" that the majority in this case adopts.

> [W]e are obliged to apply *Grady* in a way that gives the "element" component significance. That means barring the second prosecution only when the conduct previously prosecuted is to be used to "establish" the element of the second crime, which I think must mean "constitute the entirety of" the element. If *Grady* is read more broadly, that is, if the second prosecution is barred whenev-

---

7. Obviously, the contours of what conduct "establishes" an essential element will have to be determined by courts applying *Grady*'s rule. I do not dispute that some line-drawing will eventually be necessary. This, however, does not present a close case. In no sense did the two overt acts at issue "establish" the conspiracy, or any of its essential elements.

er the previously prosecuted conduct is to be used only *as evidence of* an element of the second offense, then we would almost be applying a "same evidence" test. [It is] more likely that the Supreme Court expected *Grady* to apply only when the conduct prosecuted at the first trial is or may constitute the entirety of an element of the offense at the second trial.

*United States v. Calderone,* 917 F.2d at 724 (footnote omitted) (emphasis in original).[8] Judge Newman correctly adopted this position in order not to conflict with the Supreme Court's decision in *Dowling. Id.* at 724.

In addition, the majority attempts to distinguish the Third Circuit's interpretation of *Grady* in *United States v. Pungitore,* 910 F.2d 1084, 1109 (3d Cir.1990). The majority adopts the interpretation of *Grady* that the *Pungitore* court specifically rejected. This is justified, we are told, because the Third Circuit's approach is based upon a "bifurcation" of the Double Jeopardy analysis that the Tenth Circuit has already rejected. *See* Majority Opinion at 1527.

In reality, the Third Circuit's treatment of *Grady* is less about "bifurcation" than it is about how far *Grady*'s rule should be extended beyond its reasoning. The *Pungitore* court's reluctance to apply *Grady* "expansively," *id.* at 1110, was based on an examination of *Grady,* its precedential roots, and another Supreme Court case. And our supposed "rejection" of *Pungitore*'s approach, *United States v. Savaiano,* 843 F.2d 1280 (10th Cir.1988), is a pre-*Grady* case that confirms the permissibility, under the Double Jeopardy Clause of

prosecuting a defendant for both attempt and conspiracy offenses arising from the same conduct.

The question in *Pungitore* was whether the *Grady* rule barred a successive prosecution for a compound-complex felony when the defendant had already been prosecuted for one of the predicate offenses. *United States v. Pungitore,* 910 F.2d at 1109. The Third Circuit noted that both *Grady* and the cases upon which it relied for its reasoning, *Illinois v. Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) and *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), involved a "discrete criminal event." *Id.* at 1110. The court also noted that the *Brown* Court, much like the *Grady* Court, was concerned with the practice of avoiding the Double Jeopardy Clause by "the simple expedient of *dividing a single crime into a series of temporal or spatial units." Id.* (quoting and adding emphasis to *Brown v. Ohio,* 432 U.S. at 169, 97 S.Ct. at 2227).

The Third Circuit recognized, however, that some crimes *are* "made up of 'a series of temporal or spatial units,' " *id.,* and that the Supreme Court's decision in *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), *reh'g denied,* 473 U.S. 927, 106 S.Ct. 20, 87 L.Ed.2d 698 (1985), was "more closely analagous" to the question before them. In *Garrett,* the Supreme Court held that a continuous criminal enterprise (CCE) offense and its predicate offenses are separately punishable, and that "prosecution for a CCE offense after an earlier prosecution for a predicate offense is constitutional under the Double Jeopardy Clause." *Garrett v. United*

---

**8.** It is clear that Judge Miner, in dissent, not only agrees with this interpretation of "establish," but also holds to the literal language of the rest of the *Grady* rule. *Id.* at 726–29 (Miner, J., dissenting). Judge Pratt, who wrote the opinion of the court, does not explicitly address the "establish" element of *Grady.* He repeatedly emphasizes his concern, however, that the two prosecutions in that case—which were both for drug conspiracies—were prosecutions for the same offense disguised only by different descriptions of the requisite conspiracy agreement. *Id.* at 721 ("this conduct may not be prosecuted a second time in order to establish

an 'agreement' that differs from the first crime only in that the indictment happens to describe it differently"). Here, not only are the substantive offenses different, they also contemplate different times, places, and actors.

The Second Circuit has subsequently expanded *Calderone* beyond the limitations of Judge Newman's concurrence. In *United States v. Gambino,* 920 F.2d 1108 (2d Cir.1990), the panel abandoned any analysis of the "establish" element. *Id.* at 1112. To the extent *Gambino* declines to correctly apply this and other elements of the *Grady* rule, I find the decision incorrect.

*States*, 471 U.S. at 786, 105 S.Ct. at 2415. Although decided before *Grady*, *Garrett* distinguished *Grady*'s predecessor, *Brown v. Ohio*, as involving a "single course of conduct—driving a stolen car." *Id.* 471 U.S. at 787, 105 S.Ct. at 2416. That single act had supported prosecutions of a defendant for both joyriding and theft. This was unacceptable because "[e]very moment of his conduct was as relevant to the joyriding charge as it was to the auto theft charge." *Id.* Conversely, the CCE offense before the *Garrett* Court "spanned 5½ years and several states," while the predicate offense indictment specified only several days within a two month period. *United States v. Pungitore*, 910 F.2d at 1111. The *Garrett* Court cautioned against "ready transposition" of the "principles of double jeopardy from the classically simple situation presented in *Brown* to the multilayered conduct, both as to time and to place, involved in this case." *Garrett v. United States*, 471 U.S. at 789, 105 S.Ct. at 2416.

The Third Circuit concluded that *"Grady*, which finds its roots in 'single transaction' cases such as *Brown*, is no more applicable in the instant circumstances than *Brown* was in *Garrett." United States v. Pungitore*, 910 F.2d at 1111. This holding was not based upon "an approach to double jeopardy issues that this circuit has already rejected," as the majority claims. Majority Opinion at 1527. To the contrary, the Third Circuit's holding was based upon the Supreme Court's decision in *Garrett*. And, as the Third Circuit noted, nothing in *Grady* indicates an intention to overrule *Garrett*.[9] *United States v. Pungitore*, 910 F.2d at 1111 n. 29.

The Tenth Circuit case that the majority cites—*United States v. Savaiano*, 843 F.2d 1280 (10th Cir.1988)—does not reject the approach of either *Garrett* or *Pungitore*. In *Savaiano*, we held that "separate sentences may be imposed for dual convictions of conspiracy and attempt under [21 U.S.C. § ]846," *id.* at 1293, *regardless* of whether the underlying conduct could be characterized as "a single act, course of conduct, or transaction." *Id.* at 1292 (citing with disapproval *United States v. Touw*, 769 F.2d 571, 574 (9th Cir.1985)). We refused to categorize the underlying conduct because its category was irrelevant: "Once conspiracy and attempt are identified as separate crimes, separate punishment follows, just as separate punishment may be imposed for convictions on conspiracy and the completed crime." *Id.* at 1293.[10] Thus, if it rejects anything, *Savaiano* rejects the interpretation that the majority adopts today.

The majority could learn from the Third Circuit's reluctance to extend *Grady* beyond its roots. The reasoning behind *Garrett* similarly applies to prosecutions for conspiracy. Like compound-complex felonies, conspiracy often involves "multilayered conduct, both as to time and to place."[11] *Garrett v. United States*, 471 U.S. at 789, 105 S.Ct. at 2416. The majority's position would prohibit any temporally separate prosecutions for attempt and conspiracy with overlapping evidentiary support.[12] I do not believe that either Congress or the Supreme Court intended such a result, particularly in the area of drug offenses.

In sum, when each of its elements is applied, the *Grady* rule does not warrant reversal of Felix's conviction on Count 1.

**9.** The Third Circuit also applied *Garrett* in *United States v. Esposito*, 912 F.2d 60, 63–65 (1990) (rejecting a Double Jeopardy challenge to prosecution for predicate acts *after* the RICO prosecution and discussing both *Garrett* and *Grady* at length).

**10.** While we further commented that the Ninth Circuit's categorization approach guaranteed additional litigation and provided little guidance to the parties or the district courts, *United States v. Savaiano*, 843 F.2d at 1293, this dicta did not constitute our *ratio decidendi*, and was limited to the narrow issue before us in *Savaiano*. At

any rate, we were (and are) not in a position to "reject" the Supreme Court precedent embodied in *Garrett*.

**11.** Here, Felix's Oklahoma conspiracy indictment spanned four months, while the prior Missouri attempt indictment confined itself to acts committed within a six-day period.

**12.** Moreover, in rejecting *Pungitore*'s analysis, the majority's interpretation of *Grady* risks stifling prosecution of all complex, continuing criminal offenses.

Applying *Grady*'s plain language, conduct constituting the offense for which Felix was prosecuted, i.e., conduct constituting an attempt to manufacture methamphetamine between August 26 and 31, 1987, was not proven in Felix's Oklahoma prosecution to establish an essential element of the conspiracy charge.

## CONCLUSION

The majority adopts an interpretation of *Grady* so expansive that it casts a shadow over a great part of accepted criminal law and procedure. There is no indication in *Grady* that the Supreme Court intended such a result.

Examination of *Grady*'s actual holding reveals that it stands for a relatively narrow proposition: prosecutors may not, to establish an essential element of a charge, attempt to prove conduct that constitutes an offense for which the defendant has already been prosecuted. This squares with Fed.R.Evid. 404(b), *Dowling, Garrett,* and the rest of our jurisprudence. The majority's holding does not.

I am mindful of the abuses of successive prosecution that the Double Jeopardy Clause is intended to prevent. The State must "not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity." *Grady v. Corbin,* 110 S.Ct. at 2091 (quoting *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)). But the Oklahoma prosecution was in no way an attempt to re-convict Felix for the same offense, or even the same conduct. The "ordeal" Felix underwent was the natural result of committing a series of separate federal drug offenses during the summer of 1987.

Accordingly, I dissent. The judgment of the district court should be Affirmed.